**No. 68382.**—Benjamin Berg Co. and Harper, Robinson & Co. *v.* United States, protest 61/22858 (Los Angeles).

WILSON, Judge: This protest is directed against the action of the collector of customs in refusing to allow drawback under the provisions of section 313(c) of the Tariff Act of 1930 (19 U.S.C. § 1313(c)) on the exportation of 10 type L6 zoom television camera lenses, imported from France, which, it was claimed, did not conform to the specifications of the importer's order.

The statutory provisions relied upon read as follows:

Section 313(c) of the Tariff Act of 1930:

## SEC. 313. DRAWBACK AND REFUNDS.

\*      \*      \*      \*      \*      \*      \*

(c) MERCHANDISE NOT CONFORMING TO SAMPLE OR SPECIFICATIONS.—Upon the exportation of merchandise not conforming to sample or specifications or shipped without the consent of the consignee upon which the duties have been paid and which have been entered or withdrawn for consumption and, within ninety days after release from customs custody, unless the Secretary authorizes in writing a longer time, returned to customs custody for exportation, the full amount of the duties paid upon such merchandise shall be refunded as drawback, less 1 per centum of such duties.

It was stipulated between the parties that the regulations pertaining to drawback had been complied with (R. 22).

Plaintiffs introduced in evidence certain exhibits as follows: Plaintiffs' exhibit 1 consists of a page from the importer's catalog illustrating a so-called "C" mount adapter on one of the lenses of a camera (R. 7); plaintiffs' exhibit 2 consists of an exact copy of the order signed by the importer for the 10 lenses in question, being designated in the order as "10 each 20–80mm f/2.5 Angenieux L 6 zoom lens for Vidicon, with viewfinder, per your drawing Number 17998A." The order in question further states "Above order confirms discussions with M. Angenieux in Los Angeles. Please do not duplicate"; plaintiffs' collective exhibit 3 (R. 15) consists of the drawing 17988A, referred to in plaintiffs' exhibit 2. This drawing contains, as translated (R. 15), the following:

Note: The mounting system of the lens is provisional, and may be altered.

Plaintiffs' exhibit 4 consists of a copy of the translation of a letter, dated September 16, 1960, from L. Granet of Etablissements Pierre Angenieux. The letter states:

It is not possible to modify these lenses to "C" mounting and it is very difficult to alter the viewfinder mask orientation.

We are designing an other L6 lens, with the same optical characteristics which has a C mount, and of which mask orientation is easy to alter. We think to have this lens in production in 3 months.

Concerning the 10 Zoom lenses you have, the best solution, we think, is to send them back to us. \* \* \*

Plaintiffs' exhibit 4 also contains the following statement:

The lenses you received are exactly made according to this drawing. [R. 17.]

Defendant's exhibit A consists of another copy of plaintiffs' exhibit 4. The exhibits in question will be hereinafter referred to as is deemed pertinent in our determination of the issue here presented.

The only testimony in the case was that of Mr. Benjamin Berg, president of the importing company in question. He stated that he was the representative

for certain English and French manufacturers of "optics, photograph and television lenses," supplying a great part of the latter used in the United States (R. 4). Mr. Berg testified that he was familiar with the requirement of the "Vidicon" TV cameras manufactured and used in the United States. In this connection, he stated that all of the Vidicon cameras in the United States use a "C" mount lens, describing a "C" mount as follows:

"C" mount is a standard mount that is used in the United States, which was developed many years ago, which is one inch in diameter, 32 threads to the inch, and has a 6.690-inch distance from the focal plane to the lens set. This is standard; otherwise if every camera manufacturer had a different standard for mounting his lenses no lens manufacturer could make lenses for everybody. So this is more or less a standard which has been set, such as standards are set in other areas. [R. 6.]

Plaintiffs' witness testified that he had met with the supplier of the imported merchandise prior to ordering the lenses in question (R. 9) and asserted that all of the discussions had with the supplier, as to specifications, had not been reduced to writing (R. 11). He stated that he had verbally ordered 10 of the L6 lenses and, subsequently, sent a confirming order (plaintiffs' exhibit 2) (R. 12). Mr. Berg further testified that the supplier of these lenses, Mr. Angenieux, "understood" that the L6 lenses were to be mounted in a similar manner as certain L5 lenses previously ordered (R. 16). He testified that when he found out the imported lenses did not have a "C" mount, he wrote to the supplier concerning this deficiency. As appears in plaintiffs' exhibit 4, heretofore referred to, the supplier in the letter, dated September 16, 1960, advised the importer that it was not possible to modify the imported lenses to a "C" mounting and that another L6 lens was being designed with a "C" mount, suggesting, in this connection, that the imported lenses be returned.

On cross-examination, plaintiffs' witness admitted that, although the order for the imported lenses as per drawing did state that some of the specifications might be altered, no alteration was ever made in writing (R. 20).

The issue in the case at bar, in which the importer claims the benefit of drawback on the imported lenses under the provisions of section 313(c), *supra*, is whether or not the merchandise in question conformed to specifications. In our opinion, the evidence adduced by the plaintiffs in this case is insufficient to support their claim, as will be more fully developed below.

As disclosed by the record, there is no written evidence that the "C" mount was a required specification of the imported lenses. In this connection, the testimony of plaintiffs' witness was to the effect that there was a verbal agreement with the supplier of the merchandise that the imported lenses were to have a "C" mount. However, this testimony, in our opinion, cannot be reconciled with the subsequent statement of the witness, Berg, that Mr. Angenieux, the seller of the lenses under consideration, "knew perfectly well we only use 'C' mount lenses" (R. 18–19). It would appear that, if there was such an agreement as claimed by the plaintiffs, the above explanation by plaintiffs' witness that the supplier knew that only "C" mounts were required would not be necessary. It may be noted that the record in this case contains no supporting evidence from the supplier that there was such a verbal agreement, as claimed by the importer. Further, as appears by the record, the discussions held by the importer with Mr. Angenieux, as to the purchase of the lenses in question, were had initially during the period of June 1960. The lenses were imported on August 6, 1960. As disclosed in plaintiffs' exhibit 4, a letter, dated September 16, 1960, from Mr. L. Granet, director of the seller's factory, the importer was informed to the effect that it was not possible to modify the imported lenses to a "C" mounting and

that the supplier was designing another L6 lens "with the same optical characteristics which has a C mount." If, as claimed by the plaintiffs, the supplier "understood" that the lenses which were ordered had to have a "C" mounting, it would seem that the manufacturer would not have shipped the lenses as imported, knowing at the time that he did not have in stock L6 lenses with a "C" mounting. Plaintiffs, in this case, give as an explanation for the shipment of the imported lenses that "there was a failure of communication somewhere between Mr. Granet and Mr. Angenieux" (R. 18). However, there is no corroboration of this statement. In fact, the letter of September 16, 1960, from the representative of the manufacturer, states that "The lenses you received are exactly made according to this drawing," previously identified in plaintiffs' exhibit 2 as per the importer's order of June 23, 1960.

Plaintiffs, in support of their claim, direct out attention to the holding of the court in *Mattia Locatelli* v. *United States*, 63 Treas. Dec. 829, T.D. 46390. The situation in that case is, in our opinion, distinguishable from that in the case at bar. The merchandise involved in the *Locatelli* case, *supra*, consisted of certain "Bel Paese" brand cheese which, upon examination after delivery from customs custody, was found to be molded and, therefore, unsalable. The court therein was presented with no written evidence showing the specifications for the merchandise there imported. However, oral testimony was permitted to establish a standard for cheese such as that in question. It appeared that Bel Paese cheese was the brand of one manufacturer and that the plaintiff had been importing such cheese for over 12 years. The testimony of plaintiff's witnesses in the *Locatelli* case, *supra*, was to the effect that cheese of the character there involved "should be free of mould, have a uniform crust, a smooth, uniform crust." The court in the above-cited case held that, inasmuch as the said cheese did not conform to the specifications given by the importer to the shipper, and not being salable, the collector should have allowed drawback, as claimed. In the case at bar, however, there were written specifications given to the shipper and, as indicated by the record, the imported lenses did, in fact, conform to the specifications as ordered.

Section 22.32 of the Customs Regulations of 1954, as amended, provides in part as follows:

(b) * * * If the goods are claimed to be not in accordance with sample or specifications, the drawback entry shall be accompanied by a copy of the order for the merchandise, copies of any preliminary correspondence, and the samples or specifications on which the merchandise was ordered, together with a certificate of the actual owner that the sample or specifications submitted are those on which the merchandise was ordered, showing in detail in what manner the merchandise does not conform to sample or specifications. If no written order was placed and no sample or specifications are available, a certificate of the actual owner setting forth the specifications of his order and the method by which they were communicated to the seller may be accepted. * * *

To allow drawback in the case at bar on the basis of claimed, but not adequately established, oral agreements or understandings, despite the fact that the record herein establishes that there were written specifications covering the imported merchandise, would not be compatible, in our opinion, with the customs regulations promulgated pursuant to the provisions of the drawback statute.

On the basis of the record here presented, we are of opinion that the collector in this case properly disallowed plaintiffs' claim for drawback. The protest is overruled.

Judgment will issue accordingly.